Center. The next case for argument this morning is case number three, Appeal 21-2610, United States upon the relation of Kenya Sibley and others against the University of Chicago Medical Center and others. Mr. Mendenhall, you're appearing remotely. Can you see and hear us all right? Yes, loud and clear, your honors. All right, you may proceed. Thank you very much. My name is Warner Mendenhall. I represent Kenya Sibley, Jasmika Collins, and Jessica Lopez, who are all employees of MBO and Trustmark. The key issue in this case, I think this is going to come down to, is this issue of whether this is regulatory noncompliance or something fundamentally different. And I think it is fundamentally different. You know, with regulatory noncompliance, a contractor's failure to follow government regulations is very different than when there is a gross overpayment for labor that was admittedly not actually performed. Basically, the framework for reimbursement of cost is that Medicare providers are entitled to payment for reasonable costs. And one of those reasonable costs is bad debt. Debts are allowable in cost reports, but they have to meet criteria under 42 CFR 413.89E. And the key issue in that part, there's various requirements, but the key issue here is they have to engage in reasonable collection efforts. Now, we have UCMC as part of the defendants in this case. And of course, UCMC does start out as a victim of MBO and its own employee, Sauter, who was receiving a kickback unbeknownst, apparently, to UCMC. He was getting paid about $4,000 a month. And he was the one who was supervising the productivity reports that showed how much time and work the MBO employees did on collections. He knew, Sauter knew from the reports that he was generating, that MBO was not providing collections efforts, but he did not report this lack of productivity to UCMC. How do you come to that conclusion? The one problem that I see here for you is you have a lot of conclusory allegations, or it seems to me at least like there are conclusory allegations in the complaint. Couldn't it have been just as equally as likely that he knew that the work could be performed? I'm just going to make this up, but he knew that the work could be performed by three or four people, but he entered into a contract with your client's employers for 15 or 16 people, let's say, and then knowing that he would reap the benefit of in kickbacks for hiring more people than it took to actually do the job. You know, I appreciate that thought, but that is an inference that should not be held against us. If that inference is there, it needs to be set aside while this is... Yeah, but wait a minute. I agree with you on the inference stuff, but you can't just plead conclusions either. You can't just plead, my client worked there. My client worked at a company that breached its contract with these hospitals, which it clearly did. Those allegations are strong and they're based on fact, but then to make the leap because my client was at a company that breached their contracts with hospitals, the hospitals must have defrauded the government because my client was doing work that was directly related to reporting obligations to the government. That seems like a gigantic leap with no facts to support what happened between the reporting that your client did and then the reporting that the hospitals did to the government. Well, the initial reporting by University of Chicago is, you know, of course, they have no knowledge initially, but University of Chicago contracted for nine employees, not two. And they got work, they didn't even get work from two. They might've gotten work from, you know, two thirds of one person's work went on this contracting. So they knew what it took to do this collection. That's what they contracted for. And they absolutely didn't get it. It was just pathetic. Only two employees did anything and only one really did anything substantial on these contracts. It's just simply not enough for one person to be collecting millions and millions of dollars. And the letter that UCMC's law department sent over to MBO shows that they know that the work was not being performed, absolutely know it. And so I don't think that leap is as big as is being suggested here, your honor, with all due respect. They had audit worksheets. They went through that. They did their own audit. They were shocked and they asked for $700,000 to be returned to them. That's a huge amount of money. And that money was bad debt that they'd been paid for already by the federal government. So they had an obligation and they knew it to return that money to the federal government. That's, I hope that answers the question. So, you know, and of course, you know, they submitted the cost report. They've certified compliance with all laws and regulations on that cost report. So can I ask you, counsel, along these lines, the university hospital suggests that maybe they were doing lots of other collection work on their own, sufficient to meet the standards. I think that's a very creative way to argue. But again, it's injecting inferences that should not be injected at this level of pleading. If they want to go into that, that would be more appropriate at a summary judgment level, but not at the motion to dismiss level. We get the inferences. They're adding inference upon inference that they they're just making up. There's no basis, in fact, for that. Yet they're presenting it as if that could be a fact. It's just simply improper at this level to put those additional inferences in there. They had a duty simply to correct that cost report and reimburse the federal government for that. So I get it's a very creative way to do it. I get it. But that is not that is not appropriate. Is that is it common to share those responsibilities in hospitals between in-house and out and outside contractors? Well, your honor, I can't say that I know specifically I don't want to represent the court that I know this. I'm just saying they don't get that inference right now. If they want to bring those facts into discovery and then I've got to rebut them or deal with them. That's one thing. But to bring an inference like that in now that, oh, they're they've contracted for debt collection with this company and I guess four or five other companies to do the debt collection. That tells me they were outsourcing the debt collection activity, not that they were keeping it in-house. That's that's what I would say is implied by their own behavior. And and I don't think that anything additional should be read into that. And I don't think they get that that inference. But what obligation do you have under 9b to plead those facts? Let's say we drop let's say we dropped out for the sake of argument. Let's say we dropped out the the sufficiency of the pleadings of the breach of contract between your clients, employers and the hospital. You rely it seems like you you rely you're relying on those allegations to bootstrap the hospital to defrauding the government. But is that sufficient under Rule 9b? In other words, sort of when does the 9b requirements end and sort of notice pleading begin? Because it seems like you have met the requirements with respect to what was happening between your client's employer and the hospital. But then you rely on those allegations to make the leap to what was going on between the hospital and the government. And is that sufficient under a heightened pleading standard? Well, I what I would say is that we have we have alleged a, you know, a very clear and particular, particularized scheme that you know, and I don't want to characterize this as a breach of contract. I know it is a contract, but it's far more than a breach of contract. This, this Sauter was taking kickbacks and, you know, and hiding this from his employer in conspiracy with MBO and Trustmark. So I mean, there's a lot of activity going on here. So to characterize that just simply as breach of contract is far too, is far too minimalist. It's far more than that, clearly. Is part of your theory that UCMC is responsible for Sauter's conduct? Absolutely not. No, our theory has actually said that UCMC is not responsible for Sauter's conduct. UCMC is responsible for its own conduct once that it found out that it had received $700,000 in property properly improperly due to and based on Sauter's conduct. It's, you know, its employee that had basically stabbed its employer in the back. So I would have thought part of your answer to Judge Kirsch's question would be simply that Rule 9b does not require specific pleading of intent of knowledge. Your Honor, thank you for pointing that out. That, that is absolutely the case. It does not require, it does not require that, that specific pleading of intent. Thank you. You know, additionally in 9b, we do have, you know, we do have some individualized transactions and I, you know, I see what the judge was doing here and it almost seems like in the way the District Court judge was applying the Kermark standards that it was moving closer to some of the other circuits such as the Sixth Circuit where it's really requiring a specific bill or a specific piece of paper. We actually have that, but I think that the Seventh Circuit and Kermark was, you know, kind of special in that sense. I think that was an exception to the overall and general rule in the Seventh Circuit that you don't need to have those individualized transaction details and that there should be, you know, flexibility as long as the specifics of the scheme are understood and that, and that that was the basis for the false claim being submitted. Your Honors, I meant to reserve some time. I would like to reserve a little bit of time, but I'll take your question if possible, if necessary. All right. Thank you very much. Mr. Mendenhall, we'll hear first from Mr. Lyons-Berg for the University of Chicago. Thank you, Your Honor. May it please the Court, Andrew Lyons-Berg for Appalooh University of Chicago Medical Center. Your Honors, we've explained in our brief several reasons why the only claim in this QI-TAM case that is directed at UChicago must be dismissed, but I'd like to focus on just one of those, which relates to Rule 9b. So Relator's case against UChicago centers on the notion that the debt collection efforts provided by MBO for UChicago's debt were not reasonable. Whether debt collection efforts were reasonable is controlled by a regulation that sets out a specific checklist of actions that must be taken. If those actions are taken, the debt collection is reasonable. If they're not taken, it is not. But Relators have alleged zero facts that go to what actions were taken by MBO's employees, that is, Relator's co-workers, that aligned to the specific actions required by the regulations. And I think instructive on this point is this Court's Mamalakis case, which we cite at page 20 of our briefs. And I think that case stands for the proposition that where a False Claims Act case is premised on regulatory noncompliance, it is insufficient to just plead generally that the regulation was not complied with, but rather what you need is specific facts as to what portions of the regulation were not being followed and why. I thought this was pretty simple, that the medical center contracted with MBO to do this due diligence to make the reasonable collection efforts, and then you found out that they weren't even coming close because of this crooked deal with Mr. Sautter. Well, I think the inferential leap that the Relators are taking here is this unsupported conclusory assertion that two people could not possibly have done the necessary work. Well, then why did you contract for nine people? Well, importantly, Your Honor, the allegation in the complaint is not that you, Chicago, as a good-faith actor, contracted for nine people. It's that Keith Sautter, who was on the take from MBO specifically to overbill UChicago, contracted for nine people. And that's in the complaint at paragraphs 40 and 41. But even apart from that, I think that issue sort of goes to a Rule 8 plausibility standard. But even setting that aside... I mean, I don't know that we have to choose between different plausible forms of fraud here, do we? Isn't that for a later stage of the case? Well, even if that is the case, Your Honor, and as we've explained in the brief, I think it's at least as likely, if not more likely, as Judge Kirsch was discussing, that the fraud was the way that we described. But even if setting all of that aside, the allegations still don't satisfy the particularity requirement as distinct from a plausibility requirement as to why it is that two employees could not have done, could not have satisfied the particularized regulatory steps that under this regulation has to be taken. And it's not as if those sorts of facts are outside of the knowledge of relators like this. So, for example, facts that connect two employees' work to the amount of debt that was referred could be, in my experience, it takes X number of minutes to satisfy, to generate an original bill. It takes Y number of minutes to generate a follow-up bill, all of which are required under the regulation. And then some sort of, in my experience, the average size of a debt, of one account of debt is X. And without allegations like that, it's not possible to just say two people couldn't have done it. 9B requires more than that. And I think instructive on that point is the Presser decision. And there, one claim was allowed to go forward. Another claim was not. And the claim that was held not to satisfy Rule 9B, the relator alleged that certain patients had been given medical treatment and Medicare was billed for it, but the relator asserted that it was not medically necessary, which is the standard for reimbursement under the regulations. And what the court said there was that that was insufficient to satisfy 9B because, quote, the complaint does not provide the reasons why these treatments were medically unnecessary, other than the relator's personal view, and were therefore, quote, not supported in any concrete manner. And so I think it could be possible to satisfy. Right. As you may recall, the panel on that point was not unanimous. Of course not. But there also was a critical question that if you're going to require that level of pleading, as this course goes forward under Iqbal and Twombly and trying to figure out what's required, why not allow an opportunity to amend? Well, Your Honor, specifically in this case, the district court highlighted this exact failing in its decision dismissing the First Amendment complaint. It said it is necessary. It said that the reasonableness of collection efforts is determined only with respect to this regulation. It is necessary to plead the requirements of this regulation in order to satisfy it, to plead this theory that you are attempting to bring. And the relators did not do that. So I think that is certainly the district court was within its discretion to dismiss this claim with prejudice when it instructed specifically what would be necessary to plead this claim and the relators didn't do it. Let me ask. I know that with respect to amending the complaint, the relators haven't explained here how they would plead differently if they had an opportunity to amend. But based on the contracts, the contractual relationship between the relators, employers, and the hospital, based on those documents or those contracts, could the relators have made specific allegations as to what was going on at the hospital with respect to the hospital's reporting obligations to the government? In other words, the relators can get from point A to point B, but how do they get from point B to point C? Can they do that based upon the contracts between their employers and the hospitals? I think one of many failings in this case is that they can't do that. They were employed by MBO and they do not know what was happening at UChicago. But I think perhaps the more fundamental failing here is, as I've described, there is nothing that goes to the regulatory structure that is the only thing that determines whether efforts were reasonable. And I would point the court to the allegations in this same complaint against Trustmark, which is alleged to be MBO's sister company that did debt collection for other hospitals other than UCMC. And there they do allege specifically what parts of the reasonable debt collection effort regulation were being violated. So there the allegation is debts were being written off before 120 days, although the regulation prohibits that, and were being written off without follow-up bills or other communications being sent, and the regulation prohibits that. That sounds sufficient to you. I would say that that may very well be sufficient, but that claim has nothing to do with UChicago. Would you agree, Mr. Landsberg, that at least one of the principal purposes of UCMC's contract with MBO, if I get all the letters right here, was to ensure that the reasonable debt collection efforts would be made so as to be able to claim reimbursement for Medicare bad debt? I think the purpose was to collect the debt. As I think has been mentioned, there aren't allegations in this complaint that go to what may have been done by UChicago on the back end to check this work or whether the extent to which this debt was actually, how much of it was referred to MBO. And again, the nine-to-two discrepancy is based on a participant in the conspiracy is the one who is contracting for nine employees. All right. Thank you very much, Mr. Landsberg. We'll next hear from Ms. Marmer for MBO and Trustmark. Good morning, Your Honors. May it please the Court, Sarah Marmer on behalf of MBO and Trustmark. Before I start my prepared remarks, I just do want to point out that the word conspiracy has been thrown around twice in this argument, and there is no allegation of conspiracy in the Second Amendment or even the First Amendment. Isn't that pretty obvious, what was happening between MBO and Sodder? There was an allegation. What there is attached to the complaint is a letter alleging a breach. There is not a response to that letter. So all we have is an allegation of breach. There was no lawsuit filed. There was no judgment reached. What we have is an allegation, and that's exactly what the trial court judge said. It's that there was an allegation of breach of contract, notably in the letter, and presumably UChicago Medicine has excellent lawyers who could have said there was a conspiracy or there was a fraud here, but none of those words are used in that letter, and I think it's important for us to stick as much as we can to the actual record. The other fundamental problem that the relators face with my clients is that they concede that my clients never made any statement to the government with the intention of receiving money from the government that was false. So here's my trouble with that, Ms. Marmer. I don't see where that requirement comes from, given that the relators are saying that they're relying upon the cause, someone else to make a false claim language in the statute, and for generations such claims have been valid under the False Claims Act. Well, Your Honor, I was going to go straight to the cause argument because I think it's deeply problematic. The problem with the cause argument, on the record before this court, there is not a single case cited to this court where a third party, who itself didn't make a direct statement to the government, was held liable under the False Claims Act, and the Escobar... How about... Sorry. To some degree, yes, but the problem is that in the subcontractor cases that are before this court, none of them are cases where the entity making the actual statement itself didn't know that there was any falsity. That's point number one. That's not required. Well, I would respectfully disagree, Your Honor. Okay, suppose you get somebody building a highway for the federal government, and you've got a general contractor who submits payment requests to the federal government, and you've got a subcontractor who's falsely certifying quality or something else with the expectation that then the general contractor will assert compliance with the contract and entitlement to payment that is then used to pay the subcontractor. That's routine under the False Claims Act. I actually don't think there is a case that's like this one in that sense, because the cases we've seen, I've looked at all the cases after they brought this argument up. Are you talking about only the cases cited by the parties in this case? By the parties in this case. I'm talking more generally about False Claims Act jurisprudence, where subcontractors can routinely be held liable for defrauding the federal government, regardless of whether the general contractor knew or did not know about the fraud. Well, in those cases, there may well be, and I don't know those cases because I haven't seen them, and I did look for them. Start with Hess in 1943. You can go back generations with these things. Well, the point I would like to make is that Escobar actually tries to define the term cause in its decision, and what they say is those who present or directly induce the submission of false or fraudulent claims. I don't believe that this case is a case where there was a direct inducement of the submission of a false or fraudulent claim, in part because, as I've noted, the problem is that there's no allegation that the clients knew that what they were getting was false or fraudulent. They don't have to. Well, I believe... I know the relators are saying that, and that's relevant to their claim against UCMC, but they don't have to prove that as to your clients if the submission of the false claim is directly foreseeable. I'm not sure. Under Escobar, I'm not sure that the Supreme Court would agree with that position. I think the Supreme Court was saying that we don't read the False Claims Act as broadly as that. I would also say that they haven't alleged some of the things that are absolutely required in a False Claims Act case. This is what this circuit has said, and Escobar has also said, that you have to say that the defendant made a knowing false statement in order to receive money from the government, and that's one of the big differences here between a subcontractor who says, I did X work. Please pay me for that X work. Here, my clients are not alleged to have said, I did reasonable collection efforts. Government, please pay me for those. UCMC or its other clients paid for those collection efforts, but no money flowed from the government under the Relators Theory from the government to my clients. So that's a fundamental problem that they face that is different from the contractor cases that you're describing. The other problem is there is no allegation at all of materiality, which Escobar says for a regulatory violation you must make. There is a single reference to material, the word material, in the Second Amendment complaint, and it's at paragraph 22, and all it is is boilerplate. Does the regulation make those collection efforts material to the reimbursement for bad debt? I don't believe that there is evidence that it does. We just heard an argument that says it's absolutely critical, the UCMC argument is it's absolutely critical to show that you either do or do not comply with that checklist. That may have been critical to the client, but it's not clear that it's critical to the government, and what Escobar says is that you have to. It's the government's regulation. That's right, but Escobar says that mere violation of a regulation, or even a breach of contract without more, is not sufficient. That's Escobar, and that's also Berkowitz. So the problem we have here is... No, but false certifications of compliance with contracts are actionable, right? My client never made a false certification of compliance with contracts. Did they cause it, is the question. Pardon me? Did they cause the UCMC to do that, is the question. I think the problem is that the certification here, and this is part of what Escobar was dealing with, is that it's a very broad certification, so that is part of the point. Since Escobar, what courts have really been struggling with is how important is this regulation, and what is the evidence, and really it's the plaintiff's burden, not ours, to assert materiality. They didn't do that here. Did you want to say anything about the retaliation claims? Yes, Your Honor, and I really do think it's important to establish about retaliation. These relators, none of them ever actually worked on the UCMC account. None of them alleged that they ever actually worked. I thought Sibley's point was that's the problem. She saw bills to UCMC saying she did work on it. Sure, but the problem is that doesn't... And therefore knew that was false. Except the problem is that doesn't give her a foundation to say that the amount of effort that was expended was inadequate. That's the problem. It's the same problem with the issue as to University... Sorry, Community Hospital of Munster. These relators did not work on that project, but they have our generalized allegations of mistakes being made, and one very vague allegation of somebody saying don't do this before 120 days before with no connection to any particular client. And my argument is that you have to look at what they knew at the time when they were making their arguments, and their arguments at best are arguing there was a breach of contract or a regulatory violation, not trying to stop a false claim to the government or money from the government. Thank you, Counsel. Thank you, Your Honor. Mr. Mendenhall, rebuttal.  Looks like you're on mute. Okay, I'm off. Thank you very much for pointing that out. Yeah, I mean, clearly, and I think I already said this, this is not a mere regulatory violation. This is gross underperformance, and they knew directly because they saw their names. Kenya Sibley saw her name on the hour sheet having been billed, and no work was performed. The federal government is, you know, and then UCMC is submitting bad debts to the federal government. Mr. Mendenhall, where is that allegation? Where is that allegation based upon your client's knowledge that the hospitals were submitting bad debt to the government? Well, we submitted the cost reports. Right. But which ones were bad debts? I mean, putting Caremark aside and putting Judge Lina Weber's analysis of Caremark, where are the allegations that bad debts were actually submitted to the government? Well, first of all, we know it from UCMC's request for reimbursement for the $700,000. That money had already been reimbursed to them. I mean, we can't— No, where does it say that in the complaint? Where does it say your clients had knowledge of this to sufficiently plead that? In other words, it seems to me like you need to get into discovery to prove that there were actually submissions of bad debts from the hospital to the government. No, Your Honor. To actually do it as a completely identified debt in terms of patient and everything else, yeah, we would need some discovery. But we know overall there was $700,000 by UCMC and— But what part of that was bad debt? 15 percent, 40 percent, 60 percent, 100 percent? And how do your clients know that? Maybe zero. We know it because we have the information from UCMC. UCMC knows it. They told us. We have the document. We have their letter. Out of the $2.8 million, $700,000 is bad debt. Now, what patients that involves particularly, it's thousands of patients, and we don't have that. But we know from UCMC and we know from community hospital it's $500,000. We know what the bad debt is. We know the amount, the overall amount. We know the specifics of the scheme. I'm sure we could go in and break down patient by patient what those were. This whole thing is about the—moving on to UCMC, this is about UCMC's inaction. It's not—you know, there's an inaction that they take that they should have responded by returning these funds to the federal government in 60 days, and that's what led then to the regulatory violation. So they've gotten it a little bit reversed, I think, in the argument. They needed to make a change to that cost report. I would like to get to the retaliation briefly, if I may. You know, Sibley observed. She's a manager. She knows what's going on there. She knows how many people you need to take, you know, to collect on these debts. So she absolutely understands these false invoices and that one of the employees named Lufrida Shine basically wasn't doing any work. And so she knows that. And, you know, when she brings her complaints to her bosses, I mean, there's a number of complications, but she ends up getting fired. Jasmika was the same way. She was the manager of Trust Mart's bad debt collections and legal department where she staffed the department. She knows what activities these employees should be doing and the level of activity they need to collect, you know, to collect on these bad debts. Additionally, these clients are in the hospital software systems. They're inputting data that goes directly into these hospital systems, and they know the data is bad. You know, when Collins told VP Shade that they were violating the regulation 413.89E, Shade instructed that rules that Shade was in charge and that she must follow the rules not of the federal government, but the rules set by MBO and Trust Mart. And she was even told not to use the term illegal with staff. All right, counsel, thank you very much. Your time has expired, and we will take the case under advisement with thanks to all counsel.